Andrew Perrong
Counsel for Plaintiff
Email: a@perronglaw.com
Perrong Law LLC
2657 Mount Carmel Avenue

Glenside, PA 19038
Telephone: (215) 225-5529

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| JONATHAN RYAN BAHR, individually and on behalf of a class of all persons and entities similarly situated, | Case No. 2:26-cv-01756-JAT |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| vs. | |
| AGILITY INSURANCE SERVICES, LLC, | |
| and | |
| JUSTIN SURKES | |
| Defendants. | |

**Preliminary Statement**

1.      Telemarketing calls are intrusive. A great many people object to these calls, which interfere with their lives, tie up their phone lines, and cause confusion and disruption on phone records. Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the Telephone Consumer Protection Act of 1991. Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227). As Congress explained, the law was a response to Americans 'outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers' *id.* § 2(6), and sought to strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms' *id.* § 2(9).

2.      "The law opted for a consumer-driven process that would allow objecting individuals to prevent unwanted calls to their homes. The result of the telemarketing regulations was the national Do-Not-Call registry. *See* 47 C.F.R. § 64.1200(c)(2). Within the federal government's web of indecipherable acronyms and byzantine programs, the Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, he can add his number to the list. The TCPA then restricts the telephone solicitations that can be made to that number. *See id.*; 16 C.F.R. § 310.4(b)(iii)(B) ('It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to . . . initiat[e] any outbound telephone call to a person when . . . [t]hat person's telephone number is on the "do-not-call" registry, maintained by the Commission.')…Private suits can seek either monetary or injunctive

2

relief. *Id…* This private cause of action is a straightforward provision designed to achieve a straightforward result. Congress enacted the law to protect against invasions of privacy that were harming people.  The law empowers each person to protect his own personal rights. Violations of the law are clear, as is the remedy. Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649-50 (4th Cir. 2019).

3.    Moreover, as the Supreme Court has explained, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back. As relevant here, the Telephone Consumer Protection Act of 1991, known as the TCPA, generally prohibits robocalls to cell phones and home phones." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2343 (2020).

4.    Plaintiff Jonathan Ryan Bahr ("Plaintiff") brings this action under the TCPA alleging that Defendant Agility Insurance Services, LLC ("Defendant"), and its sales agent, Justin Surkes, sent telemarketing calls promoting their goods or services, including to individuals who were on the National Do Not Call Registry. Such calls were made without the call recipient's prior express written consent.  Plaintiff also alleges that Defendant marketed its services through the use of artificial and pre-recorded telemarketing calls.

5.    Because these calls were transmitted using technology capable of generating thousands of similar calls per day, Plaintiff sues on behalf of a proposed nationwide class of other persons who received similar calls.

6.    A class action is the best means of obtaining redress for the Defendants' illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

**Parties**

7.    Plaintiff is an individual residing in Maricopa County, Arizona.

8.    Defendant is headquartered in Richardson, Collin County, Texas.

9.    Defendant Surkes is an individual who resides in either New York or Florida.

**Jurisdiction & Venue**

10.    The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the Plaintiff's claims arise under federal law.

11.    Venue is proper under 28 U.S.C. § 1391(b)(2) because the calls that were initiated to the Plaintiff and the putative class that are the subject of the litigation were sent into this District and to encourage the purchase of services to be provided in this District. As such, a substantial part of the events giving rise to the claims occurred in this District.

4

**TCPA Background**

National Do Not Call Registry:

12.    The TCPA was passed in 1991 to help prevent unwanted telephone calls and solicitations, provide power to consumers to prevent unwanted solicitations, and rein in unrestricted telemarketing. *See* 47 U.S.C. § 227, *et seq.*

13.    Relevantly, the TCPA provides private rights of action for three types of telemarketing-related conduct.

14.    § 227(c) of the TCPA requires the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

15.    In this rulemaking proceeding, the FCC was instructed to "compare and evaluate alternative methods and procedures (including the use of … company-specific 'do not call systems …)" and "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish purposes of this section." *Id.* at (c)(1)(A), (E).

16.    Pursuant to this statutory mandate, the FCC established a national "do not call" database. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 ("DNC Order").

17.    This regulation is presently codified at 47 CFR 64.1200(c)(1-2).

18.    Specifically, a company may not initiate any "telephone solicitation" to a telephone subscriber "who has registered his or her telephone number on the national do-

not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 CFR 64.1200(c)(2).

Robocalls Outlawed:

19.    The TCPA also makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1). Calls made by an ATDS or with a prerecorded or artificial voice are referred to as "robocalls" by the Federal Communications Commission ("FCC") and herein. Encouraging people to hold robocallers accountable on behalf of their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(b)(3).

20.    In enacting the TCPA, Congress found: "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 § 2(10). Congress continued: "Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* § 2(12).

6

21.     The TCPA's sponsor described unwanted robocalls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone out of the wall." 137 Cong. Rec. 30,821 (1991) (statement of Sen. Hollings).

22.     The FCC has made clear that "prior express written consent" is required before making telemarketing robocalls to wireless numbers. Specifically, it ordered:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

*In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote omitted) (internal quotation marks omitted).

### Factual Allegations

23.     Defendant Agility is a company that supports and partners with independent insurance agents to access various types of insurance plans to help them grow their business.

24.     Defendant Surkes is one such insurance salesman who is affiliated with Defendant Agility.

25.     Plaintiff is a "person" as defined by 47 U.S.C. § 153(39).

26.     Plaintiff's telephone number, 480-XXX-XXXX, is on the National Do Not Call Registry and has been registered continuously since November 15, 2024.

27.     Plaintiff's telephone number is used for residential purposes and is not associated with a business.

28.     Plaintiff's telephone number is assigned to a residential telephone exchange service for consumers, not a telephone exchange service for businesses.

29.     Plaintiff uses the telephone number for personal, family, and household purposes.

30.     Plaintiff nonetheless received at least five calls from the Defendants from March 2025 to October 2025.

31.     All of the calls were made from (480) 588-XXXX telephone numbers.

32.     On March 14, 2025, Plaintiff received a call from an avatar robot from Defendants at caller ID (480) 588-8567, seeking to sell Commercial Medicare Insurance.

33.     The robot, was obviously a robot because it spoke with an unnatural voice and cadence and simply regurgitated a series of prerecorded messages in the form of pre-scripted questions, like asking the Plaintiff about his age, and if he had Medicare.

34.     After hearing the artificial voice, Plaintiff requested to speak with a live person but the call got disconnected.

35.     On June 27, 2025, Plaintiff received an avatar robot call from Defendants at caller ID (480) 588-1756.

36.     Plaintiff rejected the call.

37.    On July 24, 2025, Plaintiff received a nearly identical avatar robot call from caller ID (480) 588-3382, seeking to sell Commercial Medicare Insurance.

38.    Plaintiff heard the artificial voice of a robot asking him the same pre-scripted questions, like his age, and if he had Medicare.

39.    Plaintiff tried to speak with a live person and got disconnected.

40.    On August 4, 2025, Plaintiff received an avatar robot call from caller ID (480) 588-0637, again seeking to sell Commercial Medicare Insurance.

41.    Plaintiff answered the call, heard the same artificial voice of a robot, and then hung up the phone.

42.    The final call was on October 30, 2025.

43.    Plaintiff received an avatar robot call from Defendants at caller ID (480) 588-7824, yet again seeking to sell Commercial Medicare Insurance.

44.    Plaintiff spoke with the avatar robot about Commercial Medicare Insurance.

45.    The avatar robot asked if Plaintiff had Medicare and then the voice prompted him to answer the same pre-scripted biographical questions, including his age, and other questions to gauge his interest and eligibility for the Commercial Medicare Insurance that Defendants were trying to sell.

46.    Plaintiff then got transferred by the obvious robot to a live human agent who identified himself as Justin Surkes.

47.    Mr. Surkes stated he worked for Defendant Agility Insurance of Texas and provided a call back number of (516) 301-7558.

48.    Mr. Surkes confirmed that the purpose of the call was to sell Commercial Medicare Insurance plans.

49.    After the call ended, Plaintiff called the number Mr. Surkes provided and it connected him to Defendant Agility's business.

50.    Defendants' avatar calls were clearly artificial or prerecorded because the avatar's voice was robotic, with a generic and monotone voice and asked the same scripted questions.

51.    Defendants use such systems to pawn off the initial sales process on a robot instead of wasting valuable human agent time, like Mr. Surkes'.

52.    Moreover, the voices on the calls sounded artificial and prerecorded, and spoke with an unnatural tone, cadence, and timing, and were clearly not human, when compared to the live agent, Mr. Surkes, who Plaintiff was transferred to.

53.    The calls were intended to promote Defendants' insurance business and sell Commercial Medicare Insurance.

54.    The aforementioned calls were all made seeking to solicit the Plaintiff to purchase the Defendants' insurance services.

55.    Agility operates a type of insurance brokerage service that sells insurance through purportedly "independent" agents, including those like Defendant Surkes.

56.    Indeed, Agility's website bills itself as a "Field Marketing Organization (FMO) and General Agency (GA) for regional and national life, accident and health insurance companies" that "allow our agents to offer a broad selection of individual, group and Medicare plans that match the needs of their clients."

57.     Agility describes the support and control it provides to agents like Defendant Surkes in the following terms, "initial onboarding, carrier contracting and product training. Unlike other agencies, our support services also include bilingual support specialists, technology platforms to improve enrollment efficiency, marketing plan development and implementation, access to customized and targeted marketing materials, enrollment support and commissions advocacy with carriers."

58.     Upon information and belief, these "technology platforms" and "marketing plan development and implementation" include both the technical platforms and the training to place highly-illegal prerecorded calls to numbers on the Do Not Call Registry, precisely as done with Plaintiff.

59.     Indeed, Agility operates a blog on which it trains its agents like Defendant Surkes on various calling and compliance strategies, including marketing services offered by Agility or endorsed by Agility, including the use of AI in sales generation (https://blog.enrollinsurance.com/2025/09/how-insurance-agents-can-use-ai-and-machine-learning-in-sales/), providing compliance advice (https://blog.enrollinsurance.com/2025/10/what-agents-must-know-to-navigate-2025-aca-compliance-successfully/), discussing robocall scams, the irony of which is apparently not lost on Agility (https://blog.enrollinsurance.com/2023/02/how-robocallers-are-preying-on-elderly-with-fake-medicare-offers/), speaking negatively about the TCPA (https://blog.enrollinsurance.com/2023/12/fccs-new-rule-likely-to-cost-agencies-brokers/), providing a "call center guide" (https://blog.enrollinsurance.com/2024/11/cms-marketplace-call-center-guide/), providing call recording services

11

(http://blog.enrollinsurance.com/2022/11/agility-offers-compliant-call-recording-for-medicare-sales-with-connecturedrx/), and encouraging agents to "use a call center to compete with bigger companies" (https://blog.enrollinsurance.com/2023/10/how-health-insurance-agents-can-use-a-call-center-to-compete-with-bigger-companies/).

60.    Agility provides control over Defendants like Surkes to market insurance products using the Agility brand.

61.    Defendant Agility provides its services to individuals like Surkes and is compensated for these services by receiving a cut of the agent's commission, in addition to various other fees and costs.

62.    Agility ratified Surkes' conduct by accepting the lead and referrals generated as a result of the illegal telemarketing conduct.

63.    For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

64.    In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.

65.    The FCC has instructed that sellers such as Agility may not avoid liability by outsourcing its brokerage services and sales services to third parties, such as Surkes:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are

identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (cleaned up).

66.    In 2013, the FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574 ¶ 1.

67.    Agility is liable for any telemarketing calls placed by Surkes and using Agility's name to generate customers for Agility, including the Plaintiff.

68.    Agility hired, encouraged, permitted, and enjoyed the benefits of telemarketing by agents such as Surkes.

69.    Upon information and belief, the contracts between Surkes and Agility, contain multiple indicia of actual authority because Agility retained the right to direct and control the manner and means of Surkes' marketing and solicitation.

70.    Indeed, Agility also provided marketing materials, training, and advice to individuals like Surkes.

71.    The calls at issue identified Agility as the organization on whose behalf Surkes acted.

72.    Accordingly, Surkes had actual and/or apparent authority to act on behalf of Agility. Agility acted as principal to Surkes, who acted as Agility's agent.

73.    Agility also clothed Surkes with apparent authority by prescribing public-facing titles and permitting Agility-branded identification in marketing.

74.    Agility ratified Surkes' conduct by learning of the calls to Plaintiff, investigating the circumstances, and taking no corrective action.

13

75.     Agility's financial and branding structure further supports ratification. In addition to operating in a legal oversight capacity as a licensee in the insurance licensing context, Agility will take a cut of the agent's commission as a result of a sale.

76.     Rather than disavowing the calls as unauthorized, Agility defended them.

77.     By learning of the calls, taking no disciplinary action, and affirmatively justifying the conduct while continuing to receive commissions and fees from transactions procured through such calling activities, Agility ratified Surkes' TCPA violations.

78.     Surkes is directly liable for the unlawful calls at issue as he, or other entities subject to his control, directly placed the underlying calls.

79.     Agility controlled the day-to-day activities of Surkes by allowing him to work up insurance deals using the Agility brand name.

80.     Agility also could have prohibited Surkes from generating leads based on calls placed to numbers on the Do Not Call Registry, let alone using highly-illegal prerecorded calls.

81.     It did not.

82.     Finally, Agility could have terminated Surkes once it learned of Surkes' illegal marketing conduct.

83.     It did not.

84.     A reasonable seller would investigate into the reasons why their agents would be calling numbers using highly illegal calls to numbers on the Do Not Call Registry, let alone using even more illegal prerecorded messages.

85.     It did not.

86.     Agility hired Surkes without a proper investigation and did not terminate him when they were informed of Surkes' illegal calling conduct.

87.     As such, they knowingly ratified Surkes's conduct.

14

88.     The 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

89.     Defendant Surkes may be personally liable for the acts alleged in this Complaint pursuant to 47 U.S.C. § 217 of the TCPA, which reads, *inter alia*: "[T]he act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user *as well as of that person*." 47 U.S.C. § 217 (emphasis added).

90.     Surkes personally directed the TCPA-violative conduct at issue because he personally went off and called the Plaintiff using a robot, and then accepted the call transfer to him.

91.     The purpose of the calls at issue were to advertise and to market Defendants' insurance services.

92.     The purpose of the calls was sent to solicit the Plaintiff to sign up for the Defendants' insurance products and services.

93.     Plaintiff never asked for these calls.

94.     Plaintiff never did any business with the Defendants.

95.     The calls were made over thirty-one days after Plaintiff's number was registered with the National Do Not Call Registry.

96.     Plaintiff's privacy has been violated by the above-described telemarketing calls.

15

97.    Plaintiff never provided his consent or requested the calls.

98.    The calls were all unwanted, nonconsensual encounters.

99.    Plaintiff and all members of the Classes, defined below, have been harmed by the acts of Defendants because their privacy has been violated and they were annoyed and harassed. In addition, the calls occupied their telephone lines, storage space, and bandwidth, rendering them unavailable for legitimate communication, including while driving, working, and performing other critical tasks.

## Class Action Allegations

100.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

101.    Plaintiff brings this action on behalf of himself and the following classes (the "Classes") pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or (b)(3).

102.    Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

**Do Not Call Registry Class:** All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing call from or on behalf of Defendants (3) within a 12-month period (4) from four years prior to the filing of the case through the date of class certification.

**Robocall Class:** All persons in the United States who, (1) within four years prior to the commencement of this litigation until the class is certified (2) received one or more calls on their cellular telephone (3) from or on behalf of Defendants, (4) sent using the same, or substantially similar, pre-recorded message used to contact the Plaintiff.

16

103. Plaintiff is a member of and will fairly and adequately represent and protect the interests of the Classes as he has no interests that conflict with any of the Class members.

104. Plaintiff and all members of the Classes have been harmed by the acts of Defendants, including, but not limited to, the invasion of their privacy, annoyance, waste of time, the use of their telephone power and network bandwidth, and the intrusion on their telephone that occupied it from receiving legitimate communications.

105. Members of the Classes as defined above, are identifiable through Defendants' dialer records, other phone records, and phone number databases.

106. Plaintiff does not know the exact number of members in the Classes, but Plaintiff reasonably believes Class members number, at minimum, in the hundreds.

107. The joinder of all Class members is impracticable due to the size and relatively modest value of each individual claim.

108. Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits.

109. There are well defined, nearly identical, questions of law and fact affecting all parties. The questions of law and fact, referred to above, involving the class claims predominate over questions that may affect individual Class members.

110. There are numerous questions of law and fact common to Plaintiff and to the proposed Classes, including, but not limited to, the following:

      a. Whether Defendants made telemarketing calls to numbers on the National Do Not Call Registry;

b.  whether an artificial voice or a pre-recorded message was used to send calls;

c.  whether the telemarketing calls at issue were made to Plaintiff and members of the Classes without first obtaining prior express written consent to make the call;

d.  whether Defendants' conduct constitutes violations of the TCPA; and

e.  whether members of the Classes are entitled to treble damages based on the willfulness of Defendants' conduct.

111.  Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, and especially TCPA class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other members of the Class and have the financial resources to do so.

112.  Common questions of law and fact predominate over questions affecting only individual Class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of Class members, which will be ascertainable from records maintained by Defendants and/or their agents.

113.  The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

114.  Excluded from the Class are counsel, Defendants, and any entities in which Defendants have a controlling interest, the Defendants' agents and employees, any judge

18

to whom this action is assigned, and any member of such judge's staff and immediate family.

115.    Plaintiff is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

**FIRST CAUSE OF ACTION**
**Telephone Consumer Protection Act**
**(Violations of 47 U.S.C. § 227)**
**(On Behalf of Plaintiff and the National Do Not Call Registry Class)**

116.    Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

117.    The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by making telemarketing calls, except for emergency purposes, to Plaintiff and members of the National Do Not Call Registry Class despite their numbers being on the National Do Not Call Registry.

118.    Defendants' violations were negligent, willful, or knowing.

119.    As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf, violations of the TCPA, 47 U.S.C. § 227, Plaintiff and members of the National Do Not Call Registry Class are entitled to an award of up to $500 and in damages for each and every call made and up to $1,500 in damages if the calls are found to be willful.

120.    Plaintiff and the members of the National Do Not Call Registry Class are also entitled to and do seek injunctive relief prohibiting Defendants and/or their affiliates,

19

agents, and/or other persons or entities acting on Defendants' behalf from making telemarketing calls to telephone numbers registered on the National Do Not Call Registry, except for emergency purposes, in the future.

**SECOND CAUSE OF ACTION**
**Statutory Violations of the Telephone Consumer Protection Act**
**(47U.S.C. 227, et seq.) on behalf of the Robocall Class**

121.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

122.    The Defendants violated the TCPA by or causing to be sent via pre-recorded calls to the cellular telephones of Plaintiff and members of the Robocall Class using a pre-recorded message without their prior express written consent.

123.    As a result of Defendants' violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and Robocall Class members are entitled to an award of $500 in statutory damages for each and every violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

124.    The Plaintiff and Robocall Class Members are entitled to an award of treble damages if their actions are found to have been knowing or willful.

125.    Plaintiff and Robocall Class members are also entitled to and do seek injunctive relief prohibiting Defendants from using a pre-recorded voice in the future, except for emergency purposes.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for the following relief:

Injunctive relief prohibiting Defendants from calling telephone numbers advertising their goods or services, except for emergency purposes, to any residential number on the National Do Not Call Registry in the future;

That the Court enter a judgment awarding Plaintiff and all Class members statutory damages of $500 for each violation of the TCPA and $1,500 for each knowing or willful violation; and

An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing a Class the Court deems appropriate, finding that Plaintiff is a proper representative of the Class, and appointing the lawyers and law firms representing Plaintiff as counsel for the Class;

Such other relief as the Court deems just and proper.

**JURY DEMAND**

**Plaintiff requests a jury trial as to all claims of the complaint so triable.**

Dated:  May 15, 2026

*/s/ Andrew Perrong*

Andrew Perrong
Email: a@perronglaw.com
Perrong Law LLC
2657 Mount Carmel Avenue

Glenside, PA 19038
Telephone: (215) 225-5529
*Subject to Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2026, a copy of the foregoing was served via CM/ECF, which will electronically serve all counsel of record who have appeared.

*/s/ Andrew Perrong*

Andrew Perrong